# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

FONTAINE L. BAKER, SR.,

        Plaintiff,

v.

CHRIS BUESGEN, MR. ZEMAITIS, MR. ANGLEMYER, MS. WILBER, MS. WILHAM, MS. BARKER, JANE DOE 1-5, JOHN DOE 1-5, and DEPARTMENT OF ADULT INSTITUIONS,

        Defendants.

Case No. 23-CV-1340-JPS

**ORDER**

    Plaintiff Fontaine L. Baker, Sr., an inmate confined at the Wisconsin Resource Center ("WRC"), filed a pro se complaint under 42 U.S.C. § 1983 alleging that Defendants violated his constitutional rights. ECF No. 1. This Order resolves Plaintiff's motion for leave to proceed without prepaying the filing fee and motion to appoint counsel, as well as screens his complaint.

**1.    MOTION FOR LEAVE TO PROCEED WITHOUT PREPAYING THE FILING FEE**

    The Prison Litigation Reform Act ("PLRA") applies to this case because Plaintiff was a prisoner when he filed his complaint. *See* 28 U.S.C. § 1915(h). The PLRA allows the Court to give a prisoner plaintiff the ability to proceed with his case without prepaying the civil case filing fee. *Id.* § 1915(a)(2). When funds exist, the prisoner must pay an initial partial filing

fee. 28 U.S.C. § 1915(b)(1). He must then pay the balance of the $350 filing fee over time, through deductions from his prisoner account. *Id.*

On November 8, 2023, the Court ordered Plaintiff to pay an initial partial filing fee of $47.49. ECF No. 8. Plaintiff paid that fee on November 21, 2023. The Court will grant Plaintiff's motion for leave to proceed without prepaying the filing fee. ECF No. 6. He must pay the remainder of the filing fee over time in the manner explained at the end of this Order.

## 2. SCREENING THE COMPLAINT

### 2.1 Federal Screening Standard

Under the PLRA, the Court must screen complaints brought by prisoners seeking relief from a governmental entity or an officer or employee of a governmental entity. 28 U.S.C. § 1915A(a). The Court must dismiss a complaint if the prisoner raises claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A(b).

In determining whether the complaint states a claim, the Court applies the same standard that applies to dismissals under Federal Rule of Civil Procedure 12(b)(6). *See Cesal v. Moats*, 851 F.3d 714, 720 (7th Cir. 2017) (citing *Booker-El v. Superintendent, Ind. State Prison*, 668 F.3d 896, 899 (7th Cir. 2012)). A complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must contain enough facts, accepted as true, to "state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows

a court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

To state a claim for relief under 42 U.S.C. § 1983, a plaintiff must allege that someone deprived him of a right secured by the Constitution or the laws of the United States and that whoever deprived him of this right was acting under the color of state law. *D.S. v. E. Porter Cnty. Sch. Corp.*, 799 F.3d 793, 798 (7th Cir. 2015) (citing *Buchanan–Moore v. County of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009)). The Court construes pro se complaints liberally and holds them to a less stringent standard than pleadings drafted by lawyers. *Cesal*, 851 F.3d at 720 (citing *Perez v. Fenoglio*, 792 F.3d 768, 776 (7th Cir. 2015)).

### 2.2 Plaintiff's Allegations

Plaintiff names Defendants Warden Chris Buesgen ("Buesgen"), Mr. Zemaitis ("Zemaitis"), Mr. Anglemyer ("Anglemyer"), Ms. Wilber ("Wilber"), Ms. Wilham ("Wilham"), Ms. Barker ("Barker"), Jane Doe 1-5, John Doe 1-5, and Department of Adult Institutions. ECF No. 1 at 1. During all relevant times, the individual defendants were all employees of Stanley Correctional Institution ("SCI"), and Plaintiff was housed at SCI on unit 2a. *Id.* at 1–2. On January 7, 2022, Plaintiff's cell was extremely cold and had no hot water. *Id.* at 2. Plaintiff notified the unit officer, but it remained cold. *Id.* A smell like burned rubber began to come through the vent in the cell but the room was never checked on by the officer. *Id.*

On January 10, 2022, the heating system was still not functioning. Plaintiff and other inmates complained to unit officers, but the temperature was never checked, and it remained cold. *Id.* On January 19, 2022, the exhaust went down, and the room became even colder. *Id.* Plaintiff again complained to officers, but nothing was done, and it remained cold. *Id.*

Plaintiff continued to complain about the fumes and the cold to the unit officers on January 20, 22, 25, 27, and 29. During this time it was extremely cold outside, and the cell reflected it with temperatures as low as -16 degrees. *Id.*

On January 30, 2022, Plaintiff wrote to Warden Buesgen about the cold and fumes and how inmates were sick as a result. *Id.* at 3. Buesgen responded that temperatures were being monitored, and Plaintiff was directed to contact unit staff for future temperature issues. *Id.* Plaintiff wrote to the health service unit ("HSU") later that day about the extreme cold and fumes, but he was not seen by HSU. *Id.* Plaintiff filed an inmate complaint later that day. *Id.* On January 31, 2022, the HSU unit manager responded to Plaintiff's request and told him to talk with his unit manager. *Id.* Plaintiff then complained to the unit 2a officer, Ms. Johnson, about the fumes and the extreme cold. *Id.* Johnson said she would make a work order to have the windows re-caulked and to have someone check the fumes coming out of the vent. No one ever came and Plaintiff was left feeling sick and in extremely cold conditions. *Id.* The inmate complaint examiner dismissed Plaintiff's complaint. *Id.*

On February 2, 2022, Plaintiff again wrote to HSU about this request for medical attention. *Id.* He wrote that he experienced dizziness from the fumes and pain in his eyes and throat from a burning sensation; HSU did not see him that day. Plaintiff complained again on February 3, 2022, because the smell was so intense that all inmates came out of their cell and were unable to breath normally because of the fumes. *Id.* at 3–4. A white shirt named Ms. Parks and officers on unit 2A experienced the smell and ordered all inmates to sit in the dayroom. *Id.* at 4. Ms. Parks agreed that the smell was bad and that she would call maintenance. *Id.* Plaintiff was still

not seen by HSU despite his requests. *Id.* On February 4, 2023, the inmate complaint examiner, Wilber, sent Plaintiff's complaint back because he had filed more than one complaint a week. *Id.* Plaintiff maintains that he did not violate the rule because his complaints were exempt because they were a health and safety issue. *Id.* The same day, Plaintiff's cellmate, Mr. Adrien Durden, filed an inmate complaint about the cold and the fumes. *Id.* Plaintiff wrote to HSU again that day, repeating his pleas for help, but he was not seen and continued to suffer. *Id.*

On February 5, 2022, Plaintiff finally saw a nurse for his medical requests. *Id.* Plaintiff told the nurse about his chest and back pains from the fumes and the cold. *Id.* at 5. The nurse told him that even minimal fumes from an exhaust could be harmful, but she would not speak of it any further because it was not her problem. *Id.* The nurse went on to say, "Well a t-shirt could be made saying, 'I survived carbon monoxide at SCI, and see it as a fundraiser," and laughed. *Id.* Plaintiff felt that he was not being taken seriously as a result. *Id.* The nurse indicated that Plaintiff's cartilage was swollen, and his back was in pain from being wrapped up in a blanket for so long and that he was 'chilled to the bone.' *Id.* Plaintiff was given Ibuprofen for his pain and sent away. *Id.* Plaintiff again notified the Warden about the cold and lack of hot water in his cell that day, but he received no response. *Id.* Plaintiff also contacted the Unit 2A Manager, Wilham, that day and received the following response: "'Mr. Baker I have monitored the water and room temperature over the past 3 days. Based on these numbers I trust your cell has warmed up and you now have hot water. If this is not the case please see me during my office hours and/or let the officers know so it can be addressed in a timely manner.'" *Id.* Plaintiff saw Wilham the

following day and told her that his cell was still extremely cold; nothing was ever done and Plaintiff's cell was never checked. *Id.*

Plaintiff filed another inmate complaint on February 6, 2022, about not being seen by HSU. *Id.* On February 7, 2022, Plaintiff's complaint was affirmed. *Id.*at 6. Plaintiff complained again about the cold that day, but nothing was done. *Id.* Plaintiff was later seen by HSU that day for complaints of dizziness from exhaust fumes. *Id.* Plaintiff was told to go outside, take Tylenol and Ibuprofen and eye drops, and was sent away. *Id.* Realistically, Plaintiff could not leave his cell to escape the fumes because he needed permission to go outside. *Id.*

On February 13, 2022, Plaintiff wrote the Warden again that it had been extremely cold the last two days and that he did not have any hot water in his cell. *Id.* The Warden's office responded in writing, but nothing was done to fix the problem. *Id.* Plaintiff again wrote to HSU that day about feeling sick and that his cell was ice cold. *Id.* Plaintiff also wrote to Wilham that day; she responded that maintenance was aware of the issue and working on it. *Id.* at 7. HSU responded on February 16, 2022, that they were aware of the issue but had no control over the heat. *Id.*

On March 25, 2022, Plaintiff spoke to the building and grounds superintendent, Zemaitis, about why he never came to check on the heat, fumes, or hot water issue. *Id.* Zemaitis responded that he had not checked the rooms himself but had instead relied on the computer. *Id.* Zemaitis said that he knew the boiler was "messed up" for years, that they were working on it, and that he was sorry Plaintiff was suffering. *Id.* In February 2022, the Warden came to their unit and Plaintiff and other inmates brought up their heating issue with him. *Id.* The Warden responded that they should make

sure to sue the DAI because they were the ones responsible for providing funds to fix the issue. *Id.*

Plaintiff received information from the DOC website that the DOC had been aware of the heating and water issues since at least 2020 when it received the results of a study assessing the functions of the institution. *Id.* at 8. The reported states, "'The heating hot water distribution system deterioration is one of the facilities biggest concerns and needs to be replaced or converted…'" *Id.*

During the months of January and February in 2022, Plaintiff spoke to the social worker, Ms. Erickson, about the heating issue on numerous occasions. *Id.* Plaintiff observed her bundled up in a full coat and gloves and also saw a space heater in her office. On January 9, 2023, Plaintiff filed an open records request asking how many inmates filed complaints regarding the heat in January through March 2022. *Id.* Plaintiff received a response indicating that the institution received forty-one complaints. *Id.*

### 2.3  Analysis

The Court finds that Plaintiff may proceed on an Eighth Amendment conditions of confinement claim against Buesgen, Zemaitis, Anglemyer, Wilham, Barker, Jane Doe 1-5, and John Doe 1-5. A prisoner's claim of unconstitutional conditions of confinement is analyzed under the Eighth Amendment's cruel and unusual punishment clause. *See Farmer v. Brennan*, 511 U.S. 832, 834 (1994). A prisoner is entitled to live in conditions that do not amount to "punishment." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). Detainees are entitled to be confined under humane conditions that provide for their "basic human needs." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). "The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones[.]" *Snipes v. DeTella*, 95 F.3d 586, 590 (7th Cir. 1996).

Page 7 of 19
Case 2:23-cv-01340-JPS   Filed 04/01/24   Page 7 of 19   Document 9

To establish a constitutional violation with respect to an inmate's living conditions, he must be able to demonstrate both: (1) the conditions were objectively so adverse that they deprived him "of the minimal civilized measure of life's necessities," and (2) the defendants acted with deliberate indifference with respect to the conditions. *Townsend v. Fuchs*, 522 F.3d 765, 773 (7th Cir. 2008) (quoting *Farmer*, 511 U.S. at 834). "Life's necessities include shelter, heat, clothing, sanitation, and hygiene items." *Woods v. Schmeltz*, No. 14-CV-1336, 2014 WL 7005094, at *1 (C.D. Ill. Dec. 11, 2014) (citing *Gillis v. Litscher*, 468 F.3d 488, 493 (7th Cir. 2006)); *see also Budd v. Motley*, 711 F.3d 840, 842–43 (7th Cir. 2013). Exposure to extreme cold without alternative means to keep warm constitutes cruel and unusual punishment. *See Flores v. O'Donnell*, 36 F. App'x 204, 206–07 (7th Cir. 2002).

Here, Plaintiff alleges that he was subjected to extreme cold and harmful fumes for months that caused him serious health issues. Plaintiff alleges that he informed Defendants of the situation, and they took no action to correct the issue. Further development of the record will be needed to determine whether Plaintiff's allegations rise to the level of depriving him of life's necessities and whether Defendants' actions constituted deliberate indifference; however, at the pleadings stage, the Court finds the allegations sufficient to proceed on an Eighth Amendment conditions of confinement claim against Buesgen, Zemaitis, Anglemyer, Wilham, Barker, Jane Doe 1-5, and John Doe 1-5. Plaintiff will have the opportunity to conduct discovery to determine the identity of the Does.

Finally, Plaintiff may not proceed against Defendants Wilber or Department of Adult Institutions. For a prison official to be personally liable, he or she must have participated in some way with the alleged constitutional violation. *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996)

("Section 1983 creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional deprivation.") (internal quotation marks and citation omitted); *see also Palmer v. Marion County*, 327 F.3d 588, 594 (7th Cir. 2003). As to Wilber, Plaintiff fails to state a claim against her for her actions in relation to Plaintiff's inmate grievances. Generally, the denial of a grievance "by persons who otherwise did not cause or participate in the underlying conduct states no claim." *Owens v. Hinsley*, 635 F.3d 950, 953 (7th Cir. 2011); *see also George v. Smith*, 507 F.3d 605, 609 (7th Cir. 2007).

As to Defendant Department of Adult Institutions, "states and their agencies are not 'persons' subject to suit under 42 U.S.C. § 1983." *Johnson v. Supreme Court of Ill.*, 165 F.3d 1140, 1141 (7th Cir. 1999). This means that "[n]either the State of Wisconsin nor the State's Department of Corrections is a proper defendant." *Andreola v. Wisconsin*, 171 F. App'x 514, 515 (7th Cir. 2006). As an agency of the State of Wisconsin, the Department of Adult Institutions is not a proper § 1983 defendant. As such, the Court will dismiss Wilber and Department of Adult Institutions from this action for the failure to state a claim against them.

### 3. MOTION TO APPOINT COUNSEL

The Court will deny Plaintiff's motion to appoint counsel without prejudice. As a civil litigant, Plaintiff has "neither a constitutional nor statutory right to a court-appointed attorney." *James v. Eli*, 889 F.3d 320, 326 (7th Cir. 2018). However, under 28 U.S.C. § 1915(e)(1), a "court may request an attorney to represent any person unable to afford counsel." A court should seek counsel to represent a plaintiff if: (1) he has made reasonable attempts to secure counsel; and (2) "'the difficulty of the case—factually

and legally—exceeds the particular plaintiff's capacity as a layperson to coherently present it.'" *Navejar v. Iyiola*, 718 F.3d 692, 696 (7th Cir. 2013) (quoting *Pruitt v. Mote*, 503 F.3d 647, 655 (7th Cir. 2007) (en banc)). Whether to appoint counsel in a particular case is left to a court's discretion. *James*, 889 F.3d at 326; *McCaa v. Hamilton*, 893 F.3d 1027, 1031 (7th Cir. 2018).

While framed in terms of a plaintiff's capacity to litigate, this discretion must also be informed by the realities of recruiting counsel in this District. When a court recruits a lawyer to represent a pro se party, the lawyer takes the case pro bono. Unlike a lawyer appointed to represent a criminal defendant during her prosecution, who is paid by the government for the work, an attorney who takes a prisoner's civil case pro bono has no promise of compensation.

It is difficult to convince local lawyers to take such cases. Unlike other districts in this Circuit, *see, e.g.*, L.R. 83.35 (N.D. Ill.), the Eastern District of Wisconsin does not employ an involuntary appointment system for lawyers admitted to practice in the District. Instead, the District relies on the willingness of lawyers to sign up for the Pro Bono Attorney Panel and, once there, accept appointments as needed. *See* Pro Bono Program, *available at*: http://www.wied.uscourts.gov/pro-bono-program.

The District is grateful to the lawyers who participate in the Pro Bono Program, but there are never enough volunteers, and those who do volunteer rarely take more than one or two cases a year. This is understandable, as many are already busy attending to fee-paying clients. Although the Pro Bono Program does provide for payment of certain litigation expenses, it does not directly compensate a lawyer for his or her time. Participants may seek attorney's fees when permitted by statute, such as in successful § 1983 cases, but they will otherwise go unpaid. The small

pool of attorneys available to this District for pro bono appointments stands in stark contrast to that of the Court of Appeals, which regularly recruits counsel from across the nation to represent pro se plaintiffs on appeal. *See, e.g.*, *James*, 889 F.3d at 323 (appointing counsel from Washington, D.C. to represent the pro se appellant); *McCaa*, 893 F.3d at 1029 (same).

Additionally, it must be remembered that, when a court determines that counsel recruitment is appropriate, it can take months to locate a willing lawyer. This delay works to the detriment of all parties and contravenes Congress's instruction in Federal Rule of Civil Procedure 1 that district courts must endeavor to secure the "just, speedy, and inexpensive determination of every action." Fed. R. Civ. P. 1. Thus, looming large over each request for counsel are a court's ever-more-limited time and resources.

With these considerations in mind, the Court returns to the question presented: whether counsel can and should be recruited to represent Plaintiff at this stage in this case. First, a court asks whether the litigant has made "reasonable" efforts to obtain her own representation. *Pruitt*, 503 F.3d at 655; *Jackson v. County of McLean*, 953 F.2d 1070, 1073 (7th Cir. 1992). It is a question not often litigated; many district court judges either overlook arguably unreasonable efforts at obtaining counsel, or they impose eminently practical requirements such as the submission of evidence demonstrating that the prisoner has tried and failed to secure representation from several lawyers. *See, e.g.*, *Kyle v. Feather*, No. 09-cv-90-bbc, 2009 WL 2474627, at *1 (W.D. Wis. Aug. 11, 2009).

The first element of *Pruitt* is fairly easy to satisfy, but it is not toothless, and it is not a mere technical condition of submitting a certain number of rejection letters. If it was, then a Wisconsin prisoner litigating a § 1983 action could submit rejection letters from ten randomly selected

criminal defense lawyers from Nevada and call his work complete. This cannot be. The purpose of the reasonable-efforts requirement is to ensure that if a court and private lawyers must expend scarce resources to provide counsel for a prisoner, he has at least made a good-faith effort to avoid those costs by getting a lawyer himself. To fulfill this duty, a pro se prisoner should reach out to lawyers whose areas of practice suggest that they might consider taking his case. If he learns that some of the lawyers he has contacted do not, he should reach out to others before he concludes that no one will help him.

Plaintiff provides evidence showing that he contacted attorneys to represent him in this matter. ECF No. 2. The Court finds that Plaintiff satisfies the first *Pruitt* question.

Plaintiff's request must also succeed on the second *Pruitt* question: whether the difficulty of the case exceeds his capacity to coherently present it. This assessment must be made in light of the particular capabilities and circumstances presented by each pro se litigant. *James*, 889 F.3d at 326–27. The Court of Appeals explains:

> The second step is itself grounded in a two-fold inquiry into both the difficulty of the plaintiff's claims and the plaintiff's competence to litigate those claims himself. The inquiries are necessarily intertwined; the difficulty of the case is considered against the plaintiff's litigation capabilities, and those capabilities are examined in light of the challenges specific to the case at hand. Ultimately, the question is not whether a lawyer would present the case more effectively than the pro se plaintiff; if that were the test, district judges would be required to request counsel for every indigent litigant. Rather, the question is whether the difficulty of the case—factually and legally—exceeds the particular plaintiff's capacity as a layperson to coherently present it to the judge or jury himself. Notably, this inquiry extends beyond the trial stage of the

> proceedings. The relevant concern is whether the plaintiff appears competent to litigate his own claims, given their degree of difficulty. This includes all of the tasks that normally attend litigation: evidence gathering, preparing and responding to motions and other court filings, and trial.

*Id.* (citations and quotations omitted). While a court need not address every concern raised in a motion for appointment of counsel, it must address "those that bear directly" on the individual's capacity to litigate his case. *McCaa*, 893 F.3d at 1032.

The balancing contemplated in the second *Pruitt* step must be done against the backdrop that district courts cannot be expected to appoint counsel in circumstances which are common to all or many prisoners. *See Bracey v. Grondin*, 712 F.3d 1012, 1017–18 (7th Cir. 2013); *Pruitt*, 503 F.3d 647, 656 (observing that the Seventh Circuit has "resisted laying down categorical rules regarding recruitment of counsel in particular types of cases"); *Harper v. Bolton*, 57 F. Supp. 3d 889, 893 (N.D. Ill. 2014). Doing so would place untenable burdens on court resources. It would also turn the discretion of § 1915(e)(2) on its head, making appointment of counsel the rule rather than the exception.

Several pronouncements from the Court of Appeals appear to be in tension with this principle. First, the Seventh Circuit notes that "complexity increases and competence decreases as a case proceeds to the advanced phases of litigation." *James*, 889 F.3d at 327. It deems the "[a]dvanced phases" to include those from discovery onward. *Id.*; *McCaa*, 893 F.3d at 1032. But nearly every prisoner case proceeds to discovery, as the district court applies exceedingly lenient review during initial screening.

Second, the Seventh Circuit instructs that district courts should evaluate a prisoner's competency irrespective of the involvement of a

"jailhouse lawyer." *McCaa*, 893 F.3d at 1033; *Walker v. Price*, No. 17-1345, 2018 WL 3967298, at *5 (7th Cir. Aug. 20, 2018). How courts should do this is not clear. A court rarely knows whether a filing was prepared by the plaintiff or someone helping him. And if a court does know that the plaintiff is receiving help, how can it assess his ability to litigate without knowing which portions of the filings are his work, and which come from the jailhouse lawyer? In *Walker*, the court determined that the inmate's work product decreased in quality after his jailhouse lawyer was transferred to another prison. 2018 WL 3967298, at *6. Yet a savvy prisoner, looking to secure counsel for himself, could do this on purpose, crafting his filings to downplay his own litigation capabilities. A court would have no way to assess whether the inmate is sandbagging it.

Finally, the Court of Appeals indicates that claims involving the state of mind of the defendant, such as those involving deliberate indifference, are particularly complex. *James*, 889 F.3d at 327–28; *McCaa*, 893 F.3d at 1032. Yet a government official's culpable mental state is the foundation for most constitutional claims. Indeed, it is often the defining characteristic that sets § 1983 claims apart from their state-law tort analogues. Deliberate indifference is essential to nearly all claims of cruel and unusual punishment, excessive force, mistreatment of medical needs, and First Amendment and due process violations. *See Kingsley v. Henderson*, 135 S. Ct. 2466, 2473 (2015); *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998); *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Hambright v. Kemper*, 705 F. App'x 461, 462 (7th Cir. 2017); *Milton v. Slota*, 697 F. App'x 462, 464 (7th Cir. 2017) ("*[N]egligently* inflicted harm does not amount to a constitutional violation.") (emphasis in original). Taken together, these claims comprise the vast majority of prisoner litigation in this District. If state-of-mind issues

are generally beyond the ability of most pro se litigants to prove, then a court likely would need to appoint counsel in nearly every prisoner case. This is plainly impossible.

The guiding rule has always been that appointment of counsel is the exception rather than the rule in pro se prisoner litigation. Yet a confluence of all-too-common circumstances—discovery, jailhouse lawyers, and claims concerning state of mind—militate in favor of the appointment of counsel. As the list of reasons to appoint counsel grows, the reasons not to do so shrink. This District's resources have not kept pace.

Against this backdrop, the Court finds that Plaintiff has not presented sufficient evidence and argument showing that he cannot litigate or try this matter competently on his own. In his motion, Plaintiff indicates that his case is complex, he is unable to afford an attorney, he has limited knowledge of the law, and has various mental health issues. ECF No. 2.

It is true, as Plaintiff intuits, that a lawyer would be helpful in navigating the legal system; trained attorneys are of course better positioned to successfully litigate cases. But Plaintiff's lack of legal training brings him in line with practically every other prisoner or former prisoner litigating in this Court. Further, the Court will assist Plaintiff in this regard (as it does with all prisoner litigants) by providing copies of the most pertinent federal and local procedural rules along with its scheduling order. Thus, ignorance of the law or court procedure is generally not a qualifying reason for appointment of counsel. Plaintiff has not demonstrated that his case is exceptional to require counsel. The Court will issue a scheduling order for this case to proceed in due course and Plaintiff may seek assistance for the summary judgment process at a later date if needed.

Page 15 of 19
Case 2:23-cv-01340-JPS    Filed 04/01/24    Page 15 of 19    Document 9

## 4. CONCLUSION

In light of the foregoing, the Court finds that Plaintiff may proceed on the following claim pursuant to 28 U.S.C. § 1915A(b):

**Claim One:** Eighth Amendment conditions of confinement against Buesgen, Zemaitis, Anglemyer, Wilham, Barker, Jane Doe 1-5, and John Doe 1-5 for harmful fumes and a lack of heat and hot water.

The Court has enclosed with this Order guides prepared by court staff to address common questions that arise in cases filed by prisoners. These guides are entitled, "Answers to Prisoner Litigants' Common Questions" and "Answers to Pro Se Litigants' Common Questions." They contain information that Plaintiff may find useful in prosecuting his case.

Defendants should take note that, within forty-five (45) days of service of this Order, they are to file a summary judgment motion that raises all exhaustion-related challenges. The Court will issue a scheduling order at a later date that embodies other relevant deadlines.

Accordingly,

**IT IS ORDERED** that Plaintiff's motion for leave to proceed without prepaying the filing fee, ECF No. 6, be and the same is hereby **GRANTED**;

**IT IS ORDERED** that Plaintiff's motion to appoint counsel, ECF No. 2, be and the same is hereby **DENIED without prejudice**;

**IT IS FURTHER ORDERED** that Defendants Wilber and Department of Adult Institutions be and the same are hereby **DISMISSED** from this action;

**IT IS FURTHER ORDERED** that under an informal service agreement between the Wisconsin Department of Justice and this Court, a copy of the complaint and this Order have been electronically transmitted

to the Wisconsin Department of Justice for service on Defendants Buesgen, Zemaitis, Anglemyer, Wilham, and Barker;

**IT IS FURTHER ORDERED** that under the informal service agreement, those Defendants shall file a responsive pleading to the complaint within sixty (60) days;

**IT IS FURTHER ORDERED** that Defendants raise any exhaustion-related challenges by filing a motion for summary judgment within forty-five (45) days of service;

**IT IS FURTHER ORDERED** if Defendants contemplate a motion to dismiss, the parties must meet and confer before the motion is filed. Defendants should take care to explain the reasons why they intend to move to dismiss the complaint, and Plaintiff should strongly consider filing an amended complaint. The Court expects this exercise in efficiency will obviate the need to file most motions to dismiss. Indeed, when the Court grants a motion to dismiss, it typically grants leave to amend unless it is "certain from the face of the complaint that any amendment would be futile or otherwise unwarranted." *Harris v. Meisner*, No. 20-2650, 2021 WL 5563942, at *2 (7th Cir. Nov. 29, 2021) (quoting *Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 524 (7th Cir. 2015)). Therefore, it is in both parties' interest to discuss the matter prior to motion submissions. Briefs in support of, or opposition to, motions to dismiss should cite no more than ten (10) cases per claim. No string citations will be accepted. If Defendants file a motion to dismiss, Plaintiff is hereby warned that he must file a response, in accordance with Civil Local Rule 7 (E.D. Wis.), or he may be deemed to have waived any argument against dismissal and face dismissal of this matter with prejudice;

**IT IS FURTHER ORDERED** that the agency having custody of Plaintiff shall collect from his institution trust account the $302.51 balance of the filing fee by collecting monthly payments from Plaintiff's prison trust account in an amount equal to 20% of the preceding month's income credited to Plaintiff's trust account and forwarding payments to the Clerk of Court each time the amount in the account exceeds $10 in accordance with 28 U.S.C. § 1915(b)(2). The payments shall be clearly identified by the case name and number assigned to this case. If Plaintiff is transferred to another county, state, or federal institution, the transferring institution shall forward a copy of this Order along with his remaining balance to the receiving institution;

**IT IS FURTHER ORDERED** that a copy of this Order be sent to the officer in charge of the agency where Plaintiff is confined; and

**IT IS FURTHER ORDERED** that the Clerk's Office mail Plaintiff a copy of the guides entitled "Answers to Prisoner Litigants' Common Questions" and "Answers to Pro Se Litigants' Common Questions," along with this Order.

Dated at Milwaukee, Wisconsin, this 1st day of April, 2024.

BY THE COURT:

_____
J. P. Stadtmueller
U.S. District Judge

Plaintiffs who are inmates at Prisoner E-Filing Program institutions shall submit all correspondence and case filings to institution staff, who will scan and e-mail documents to the Court. Prisoner E-Filing is mandatory for all inmates at Columbia Correctional Institution, Dodge Correctional Institution, Green Bay Correctional Institution, Oshkosh Correctional Institution, Waupun Correctional Institution, and Wisconsin Secure Program Facility.

Plaintiffs who are inmates at all other prison facilities, or who have been released from custody, will be required to submit all correspondence and legal material to:

> Office of the Clerk
> United States District Court
> Eastern District of Wisconsin
> 362 United States Courthouse
> 517 E. Wisconsin Avenue
> Milwaukee, Wisconsin 53202

**DO NOT MAIL ANYTHING DIRECTLY TO THE COURT'S CHAMBERS**. If mail is received directly to the Court's chambers, **IT WILL BE RETURNED TO SENDER AND WILL NOT BE FILED IN THE CASE**.

Plaintiff is further advised that failure to timely file any brief, motion, response, or reply may result in the dismissal of this action for failure to prosecute. In addition, the parties must notify the Clerk of Court of any change of address. **IF PLAINTIFF FAILS TO PROVIDE AN UPDATED ADDRESS TO THE COURT AND MAIL IS RETURNED TO THE COURT AS UNDELIVERABLE, THE COURT WILL DISMISS THIS ACTION WITHOUT PREJUDICE**.