UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

FONTAINE L. BAKER, SR.,

        Plaintiff,

      v.                                                                         Case No. 23-cv-1340-scd

CHRIS BUESGEN, et al.,

        Defendants.

## DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Fontaine L. Baker, Sr., who is representing himself, is proceeding on an Eighth Amendment conditions of confinement claim in connection with allegations of a lack of heat, a lack of hot water, and "harmful fumes" at the Stanley Correctional Institution between January 2022 and February 2022.[1] Dkt. Nos. 22 & 23. On June 19, 2025, Defendants filed a motion for summary judgment. Dkt. No. 51. On September 30, 2025, Plaintiff filed a motion to supplement. Dkt. No. 79. Because no reasonable jury could conclude that Defendants were deliberately indifferent towards an objectively serious risk of harm, the Court will grant Defendants' motion for summary judgment and will dismiss the case. The Court will also deny Plaintiff's motion to supplement.

## PRELIMINARY MATTERS

Before turning to the substance of Defendants' motion for summary judgment, the Court must address Plaintiff's response materials. *See* Dkt. Nos. 70-75. Under the Civil Local Rules, a

---

[1] At some point in the case, Plaintiff appears to have named several medical defendants—Jamie Barker, Kathie Klinger-Berg, Leahanna Krizan, and Haylee Hoyt—in place of the original John and Jane Does he sued. But the Court did not allow any medical care claims to proceed through this lawsuit, *see* Dkt. No. 22 at 8-9, so the Court will disregard any claims, issues, or facts related to his medical care.

party opposing a motion for summary judgment must file a memorandum of law that is no more than 30 pages, a concise response to the moving party's statement of facts, and supporting evidence with citations to the record. *See* Civ. L. R. 56(b)(2)(E.D. Wis.). A response to the moving party's statement of undisputed facts must reproduce each numbered paragraph of the moving party's statement of facts followed by a response to each paragraph. *See* Civ. L. R. 56(b)(2)(B). If the fact is disputed, the party must include a specific reference to an affidavit, declaration, or other part of the record that supports the claim that a genuine dispute exists as to the fact stated by the moving party. *Id.* If the opposing party believes there are additional facts that prevent the entry of summary judgment, they should include a statement, consisting of short, numbered paragraphs that set forth each additional fact and include references to the affidavits, declarations, or other parts of the record that support the assertion. *See* Civ. L. R. 56(b)(2)(B)(ii).

On June 19, 2025, Defendants filed their motion for summary judgment. Dkt. No. 51. In that motion, they reproduced Federal Rule of Civil Procedure 56, Civil Local Rule 7, and Civil Local Rule 56, as required by the local rules. *See id*. The following day, on June 20, 2025, the Court entered a notice and order reminding Plaintiff that he had to file a memorandum of law, a concise response to the moving party's statement of facts, and supporting evidence in order to properly oppose the motion for summary judgment. Dkt. No. 66. On August 25, 2025, Plaintiff filed his response materials. *See* Dkt. Nos 70-75. The response materials consist of: (1) a 43 page response brief; (2) a response to the proposed findings of fact that do not comply with the local rules, specifically the failure to cite to evidence that actually shows a genuine dispute of fact; (3) Plaintiff's own proposed facts, many of which do not cite to supporting evidence; (4) two Declarations that contain many proposed facts over which Plaintiff has no personal knowledge; and (5) 180 pages of Exhibits. *See id*. District Courts are busy and do not have time "to fish a

gold coin from a bucket of mud." *U.S. ex rel. Garst v. Lockheed-Martin Corp.,* 328 F.3d 374, 378 (7th Cir. 2003). Additionally, the Seventh Circuit has "routinely held that a district court may strictly enforce compliance with its local rules regarding summary judgment motions." *Schmidt v. Eagle Waste & Recycling Inc.*, 599 F.3d 626 (7th Cir. 2010) (citation omitted). Therefore, the Court will deem admitted all of Defendants' proposed findings of fact and will disregard Plaintiff's deficient response materials that fail to comply with the local rules. *See Phoneprasith v. Greff*, No. 21-3069, 2022 WL 1819043 (7th Cir. June 3, 2022) (holding that a district court is entitled to deem unopposed facts admitted under Civ. L. R. 56(b)(4) regardless of a non-movant's detailed opposition brief, affidavit, and exhibits); *Robinson v. Waterman*, 1 F.4th 480, 483 (7th Cir. 2021) (same).

## UNDISPUTED FACTS

At the relevant time, Plaintiff was an inmate at the Stanley Correctional Institution, where Defendants were employees. Dkt. No. 55, ¶1. Specifically, Chris Buesgen was Warden; Heather Wilhelm-Copas was Unit 2A Manager; Timothy Gronski, Eric Henrichs, and Brian Starck were sergeants; Donna Johnson, Conner Hanno, David Hall, Brandon Nelson, Jacob Kratz, James Zastrow, Jesse Wnek, and Ryan Kalepp were correctional officers; Thomas Zemaitis and Stephen Anglemyer were maintenance workers; and Jamie Barker, Kathie Klinger-Berg, Leahanna Krizan, and Haylee Hoyt were medical staff. *Id*., ¶¶2-150.

On January 11, 2022, the institution experienced a failure in its central heating system. *Id*., ¶24. Maintenance staff discovered that boilers #1 and #3 had a leak; boilers #2 and #3 needed to be retubed; and boilers #1 and #4 had to be shut down entirely to avoid further damage. *Id*., ¶¶23 & 26. Because some of the boilers were shut down entirely, and water was not moving through them, the hot water coils in Unit 2A (where Plaintiff was housed) froze over and burst, meaning there was no hot water at the time either. *Id*., ¶¶3, 32-34. The maintenance workers—Mr. Zemaitis

3

and Mr. Anglemyer—along with the Unit 2A manager—Ms. Wilhelm-Copas—took prompt action in response to the situation. *Id.*, ¶25. The remainder of the defendants in the case had no role or responsibility to resolve the heating issue at the institution. *See id.*, ¶¶132, 148, & 149.

Immediately, on January 11, 2022, Mr. Zemaitis ordered a temporary boiler; contacted PBBS (the institution's boiler testing, inspection, and maintenance contractor) to obtain replacement tubes to make repairs; and directed staff to start checking the temperature to make sure they did not drop to dangerous levels. *Id.*, ¶¶30, 36, & 37. Temperatures remained between 61 and 75 degrees that day. *Id.*, ¶¶36 & 37. At 10:43 a.m., Deputy Warden Canziani (not a defendant) sent an email stating that coats and hats would be permitted in the dayrooms until boiler repairs were made and heat was restored. *Id.*, ¶28. At 2:33 p.m., maintenance staff reported that they were making progress on the boiler repairs and they hoped to have two boilers up and running by later that night. *Id.*, ¶30. Although the institution had four boilers, it could properly function on just two. *Id.*, ¶29. By 5:11 p.m., two boilers were repaired and running again, and the heat was back on. *Id.*, ¶31. But because there were still issues with frozen/leaking coils, maintenance staff decided that the heat for the showers would not be turned back on until all building heat was restored. *Id.*, ¶¶31 & 38. The plan was to get hot showers up and running within two days, by January 13, 2022. *Id.*, ¶38.

The following day, on January 12, 2022, temperatures remained between 62 and 79 degrees. *Id.*, ¶¶40 & 41. By 1:20 p.m. that day, the heat was restored on all housing units and coats and hats were no longer needed in the dayrooms. *Id.*, ¶42. By 6:15 a.m. the following morning, the building automation system logged the temperature at 81 degrees in Unit 2A. *Id.*, ¶43. Maintenance staff had set the heating system to a higher set temperature than normal, so that if the heating system went down again, residual heat would remain on the units longer. *Id.*, ¶44.

On January 13, 2022, the temporary boiler arrived. *Id.*, ¶46. The temporary boiler burned diesel fuel and needed a source of power, and the institution's heating system didn't work with the

4

temporary boiler system, so a special heat exchanger had to be connected to resolve the issue. *Id.*, ¶¶47-48. This meant that the institution's exhaust fan had to be disconnected to free up a power source, which caused the smell Plaintiff complains of in this lawsuit. *Id.*, ¶49. Maintenance staff were not worried about the smell, however, because any outside air would have passed through eight air filters before going to the cells and dayroom. *Id.*, ¶50. On January 16, 2022, maintenance staff confirmed that all areas were working properly with the boilers. *Id.*, ¶56. On January 22, 2022, boiler #3 was retubed; and on January 24, 2022 maintenance was able to get the temporary boiler up and running. *Id.*, ¶¶58 & 59.

About a week later, in the morning on January 26, 2022, the temporary boiler stopped working and was taken offline for a period of time. *Id.*, ¶62. But the temporary boiler was repaired later in the day and brought back online in the afternoon. *Id.*, ¶65. Maintenance staff then received complaints about the smell of diesel exhaust. *Id.* As noted above, this was caused by disconnecting the exhaust fan so that the temporary boiler would have a power source. In response, maintenance staff worked to restrict outside air intake by reducing the dampeners to the minimum position, so the unit had the minimum amount of outdoor air coming in possible. *Id.*, ¶65. Mr. Zemaitis also turned the smoke relief fan on at 5% to help move the air around. *Id.*, ¶63.

About a week later, in the morning of February 3, 2022, unit staff recorded temperatures had dropped to 62 degrees, so staff allowed inmates to wear hats and jackets in the dayroom. Warden Buesgen advised staff to hand out blankets if the temperatures did not rise soon. *Id.*, ¶70. By 10:43 a.m., temperatures were back up to 67 degrees. *Id.*, ¶71. However, inmates continued complaining about the smell from the temporary boiler, and they refused to remain in their cells due to the smell, so at around 8:20 p.m., maintenance staff shut down the temporary boiler. *Id.*, ¶77. Staff noted that the temperature then dropped again, so bins with extra blankets were delivered to be handed out if the temperature dropped below 64 degrees. *Id.*, ¶78. All inmates on Unit 2A were issued one additional blanket each. *Id.*, ¶79. On February 4, 2022, the temporary

5

boiler was reconnected. *Id.*, ¶82. Maintenance staff worked to manage venting to help divert the exhaust away from unit vents. *Id.*

On February 5, 2022, the temporary boiler stopped working again. *Id.*, ¶84. At 8:30 am, Mr. Anglemyer arrived onsite to resolve the issue. *Id.*, ¶85. Upon further investigation, maintenance staff discovered that, when the temporary boiler was set up, the underground pipes that ran under the recreation field were shut down, so the system wasn't pumping water through leaking pipes. *Id.*, ¶86. At that point, maintenance staff decided not to restart the temporary boiler because of the climate issues (i.e. the fumes) it was causing. *Id.*, ¶¶74, 77, & 87. The recreation pipes were still leaking, but maintenance staff did not want to risk continuing to use the temporary boiler because of the complaints of exhaust fumes. *Id.*, ¶87. By 10:30 a.m. that day, all units were increasing in temperature for air and water (despite permanently turning off the temporary boiler). *Id.*, ¶¶88 & 89. A few days later, on February 10, 2022, temperature checks were suspended because the temperatures were holding steady. *Id.*, ¶92.

On February 12, 2022, boiler #2 needed to be shut down due to a leak. *Id.*, ¶94. The following day, on February 13, 2022, boiler #4 had to be shut down due to a leak. *Id.*, ¶¶95-97. Correctional staff were advised to allow inmates to wear their coats and hats in the dayroom if the temperature dipped below 66 degrees. *Id.*, ¶103. The institution still had two operational boilers at this time, but Mr. Zemaitis asked staff on all units to start documenting temperatures again. *Id.*, ¶¶95-98. Repairs were made on one of the boilers immediately, so three boilers were working again. *Id.*, ¶100. Mechanical contractors were also scheduled to be onsite to get the fourth boiler up and running on Monday, February 14, 2022. *Id.*, ¶101. Mr. Anglemyer sent a photo of the boiler tubes that showed a clay substance baking to the bottom of the pipe. *Id.*, ¶104. Mr. Zemaitis then had a meeting with the water treatment company to give them a sample of the build-up and determine the issue and mitigate any further issues. *Id.*, ¶102. On February 14, 2022, maintenance

6

staff found another leak in a boiler that had to be repaired. *Id.*, ¶¶110-111. Correctional staff were directed to hand out blankets when temperatures fell to 64 degrees or below. *Id.*, ¶112.

Repairs on the heating system continued until March 28, 2022, when a temporary heating line was installed, resolving the heating issue at the institution. *Id.*, ¶117. The maintenance team worked hard to correct the lack of heat, hot water, and fumes every time an issue arose. *Id.*, ¶119. There were times when the heat was down due to boiler issues, but maintenance never turned anything off. *Id.*, ¶120. Correctional staff also took extra precautions to help with fume smells, including running fans, leaving cell doors open, and allowing inmates out of their cells for extended periods of time. *Id.*, ¶123.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* All reasonable inferences are construed in favor of the nonmoving party. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotations omitted).

## ANALYSIS

Under the Eighth Amendment, prisoners are entitled to "the minimal civilized measure of life's necessities," including protection from extreme cold. *Antonelli v. Sheahan,* 81 F.3d 1422, 1433 (7th Cir. 1996) (citing *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). To survive summary judgment, Plaintiff must first put forth specific and objective evidence from which a reasonable jury could conclude that he was exposed to unconstitutionally cold conditions. *Dixon v. Godinez*, 114 F.3d 640, 642 (7th Cir. 1997). The Seventh Circuit has set forth specific factors to consider when determining whether cold temperatures rise to the level of a constitutional violation: the severity of the cold, the duration of the cold, whether the prisoner has alternative means to protect himself from the cold, the adequacy of such alternatives, and whether the prisoner must endure other uncomfortable conditions as well as the cold. *Id.* at 644. Second, a prisoner must then show that prison officials were subjectively deliberately indifferent to his needs. *Id.* Prison officials must know of and disregard an excessive risk to inmate health of safety. *Greeno v. Daley,* 414 F.3d 645, 653 (7th Cir. 2005).

Based on the record, no reasonable jury could conclude that Defendants were deliberately indifferent to an objectively serious risk of harm. It is undisputed that the temperatures never dropped below 60 degrees at any point in time at the institution. *See* Dkt. No. 55, ¶¶ 36, 37, 40, 41, 43, 54, 60, 67, 68, 70, 71, 80, 83, 89, 91, 109, 114, & 116. That, coupled with the fact that Plaintiff had access to his own warm clothing, extra coats/hats/gloves, extra blankets, and time outside of his cell to go to warmer locations, establishes that Plaintiff did not suffer an objectively serious risk of harm. Those circumstances in fact come nowhere close to what is required to constitute an objectively serious risk of harm. *See e.g.*, *Smith v. Kind*, 140 F.4th 359, 371 (7th Cir. 2025) (inmate spent almost 24 hours—naked—in a cell equivalent to the temperature outside); *Dixon*, 114 F.3d at 642 (temperatures in cell averaging 40 degrees and regularly falling below freezing for four consecutive winters); *Gillis v. Litscher,* 468 F.3d 488, 490 (7th Cir. 2006) (inmate

8

Case 2:23-cv-01340-SCD    Filed 02/18/26    Page 8 of 11    Document 81

spent five days naked in a cell with only a bare concrete slab to sleep on, and the cell was so cold that the inmate had to walk 14 hours a day to stay warm); *Del Raine v. Williford,* 32 F.3d 1024, 1031 (7th Cir. 1994) (inmate was repeatedly placed naked in cell with an open window and an outdoor wind chill of 40 to 50 degrees below zero); *Henderson v. DeRobertis,* 940 F.2d 1055, 1057–58 (7th Cir. 1991) (inmate endured four days of sub-zero temperatures, broken heat system and windows, coupled with refusal to provide extra blankets or winter clothing).

Second, the record is clear that the individuals who were actually responsible for fixing the heat and ordering extra clothing/blankets—Mr. Zemaitis, Mr. Anglemyer, and Ms. Wilhelm-Copas—took immediate action to resolve the issue each time an issue arose. They ordered new boiler parts, made constant boiler repairs, communicated with outside contractors to assess and fix the situation, ordered that the temperature be constantly monitored, ran fans and left cell doors open to help with fume smells, made available extra coats/hats/gloves, and allowed inmates extra time out of their cells to stay warm. Therefore, Defendants have met their burden to show that they were not deliberately indifferent and are entitled to summary judgment.

Plaintiff's response materials focus heavily on each interaction he had with each named defendant to show that every single person named in this lawsuit was "aware" of the heating and fumes issue and allegedly did nothing. But institution staff "do not have a free-floating obligation to put things to rights." *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009). "Bureaucracies divide tasks," and "no prisoner is entitled to insist that one employee do another's job." *Id.* This division of labor is important to "bureaucratic organization" and the "efficient performance of tasks," as people who "stay within their roles can get more work done." *Id.* A defendant cannot be held liable under section 1983 "if the remedial step was not within their power." *Miller v. Harbaugh*, 698 F.3d 956, 962 (7th Cir. 2012). Here, the individuals responsible for addressing the heat/fume issue acted promptly, diligently, and reasonably; and the remainder of the defendants

9

had no personal responsibility to fix the problem. Therefore, Defendants are entitled to summary judgment.

In sum, it is unfortunate that the institution had heating issues in the months of January 2022 and February 2022. In an ideal world, the heating system would not have needed constant repairs during the coldest months of the year; and the heating system would have been repaired in full on the first attempt at the beginning of January. But the fact that institution staff made constant repairs shows that they were not deliberately indifferent towards the circumstances. Prison conditions may be uncomfortable, and even harsh, without violating the Eighth Amendment, *see Dixon*, 114 F.3d at 642, and that is the circumstance present here. The Court will therefore dismiss the case.

## MOTION TO SUPPLEMENT

On September 30, 2025, Plaintiff filed a motion to supplement, along with a Declaration and 146 pages of exhibits. Dkt. No. 79. Summary judgment briefing typically consists of a moving brief, a response brief, and a reply brief. Civ. L. R. 56(b) (E.D. Wis.). The party that bears the burden of persuasion on the motion is usually entitled to the last brief on the matter. The Court has discretion to allow supplemental materials, but supplements are limited to responding to any <u>new</u> facts or arguments raised in the reply brief. Defendants did not raise any new facts and arguments in their reply brief that requires a supplement, *see* Dkt. No. 77, and the Court will not dig through 146 pages of exhibits to see if there is anything new. Therefore, the Court will deny Plaintiff's motion to supplement.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Defendants' motion for summary judgment (Dkt. No. 51) is **GRANTED**; and this case is **DISMISSED**. The Clerk is directed to enter judgment accordingly.

**IT IS FURTHER ORDERED** that Plaintiff's motion to supplement (Dkt. No. 79) is **DENIED**.

Dated in Milwaukee, Wisconsin this 18th day of February, 2026.

_____
STEPHEN C. DRIES
United States Magistrate Judge

---

This order and the judgment to follow are final. Plaintiff may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within **30 days** of the entry of judgment. *See* Fed. R. App. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Fed. R. App. P. 4(a)(5)(A). If Plaintiff appeals, he will be liable for the $605.00 appellate filing fee regardless of the appeal's outcome. If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* with this Court. *See* Fed. R. App. P. 24(a)(1). Plaintiff may be assessed another "strike" by the Court of Appeals if his appeal is found to be non-meritorious. *See* 28 U.S.C. §1915(g). If Plaintiff accumulates three strikes, he will not be able to file an action in federal court (except as a petition for habeas corpus relief) without prepaying the filing fee unless he demonstrates that he is in imminent danger of serious physical injury. *Id.*

Under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of judgment. The Court cannot extend these deadlines. *See* Fed. R. Civ. P. 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.